**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **TIMOTHY SAWYER AND BETTY** | § | |
| **SAWYER, as next friends of E.S.,** | § | |
|    **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 6:18-cv-00007** |
| | § | <u>**JURY REQUESTED**</u> |
| **COPPERAS COVE INDEPENDENT** | § | |
| **SCHOOL DISTRICT** | § | |
|    **Defendant.** | § | |

<u>**PLAINTIFFS' ORIGINAL COMPLAINT**</u>

    **NOW COMES** Timothy Sawyer and Betty Sawyer, as next friends of E.S. (collectively termed Plaintiffs herein), by and through their attorneys, Martin J. Cirkiel with Cirkiel & Associates, P.C. and L. Todd Kelly with The Carlson Law Firm, P.C., and brings this their Original Complaint alleging that the Copperas Cove Independent School District ("School District") violated the various rights of E.S., as more specifically pled herein.   Plaintiffs reserve the right to replead if new claims and issues arise upon further development of the facts and as permitted by law.   In support thereof, Plaintiffs respectfully show the following:

## I.    PROLOGUE

1.    Sadly we live in a culture where we see, on a daily basis, example upon example of sexual harassment of females by males.   Over time, the culture has created an environment where females are fearful of reporting the sexual harassment for fear they will be disbelieved and embarrassed.   They are inevitably told that if reported, the male will respond that the sexual activity was consensual.   This is part of the cover-up that is supported by the surrounding culture.

2.      Worse yet is the fear that by reporting allegations of sexual harassment the victim will become victimized again, this time with retaliation by the hands of the very same male, who assaulted her in the first instance.  This is the second layer of the cover-up, where women are naturally inhibited from reporting allegations of sexual harassment, and this too is supported by our culture.

3.      But there are some women, more and more, who are brave enough to come forward and are willing to confront the allegations the acts were consensual, when they know they were not.   They are brave enough not to let fear of retaliation get in the way either.

4.      Waiting for the active support by the entities who are supposed to be involved in investigating the allegations of sexual harassment (who actively work to undermine the process and "cover it up") is something even more nefarious.

5.      We see it in the entertainment and sports industries.  We see it in the current electoral process in the highest levels of government, where Congress has a secret fund set up to pay off the victims of sexual assault at the hands of Congressman, Democrats and Republicans alike.

6.      We saw it just up the road from this incident, in Waco, where sadly Baylor University used all three aspects of the culture to suppress reporting and prosecution of sexual harassment on campus.

7.      Sadly, we see it in this case, where E.S. was a victim of sexual harassment and a community wide cover-up, and bravely comes forward to shine the light of truth on her story.

## II.  BRIEF INTRODUCTION TO THE CASE

8.  E.S. is now 17 years old.  She was a student at the Copperas Cove Independent School District at all relevant time relative to this action.  On December 17, 2015, E.S. was staying after school to rehearse for a play when she was sexually assaulted by a male student, "D.H.," who happened to be the son of a person who was formerly Counselor with the School District.  She reported the assault and the District failed to satisfy their duties under Title IX of the Educational Acts of 1972 §1681-1688 ("Title IX"), federal regulations, executive agency directives from the Department of Justice ("DOJ") and United States Department of Education ("DOE") *Office of Civil Rights* ("OCR"), Texas Law and School Board Policies and Procedures.   Moreover, during her involvement with the local police, hospital, advocacy center and others, E.S. and her family saw that there was a conspiracy to thwart any investigation and the truth from coming forward.  Not surprisingly, she began to experience an increase in depression and anxiety and had to leave the School District.   As such, she files this case pursuant to Title IX.

9.  For both the child and their family, there is nothing more disturbing than knowing your child was not only the victim of sexual harassment, but that you complained about such and essentially nothing was done.   To give meaning to their child's experience, they feel compelled to tell their story.  They feel a duty to do so in the hope the presentation of their story will prevent the same from happening to another child and another family.   In the course of this telling, these victims also benefit from a healing effect.  The healing and empowerment is even more pronounced, when the effort to tell their story is before a

Federal Judge and in Federal Court, where the bright light and sanitizing effect of federal law and the Judge's gaze is forced to shine upon the issue and the Defendant School District, as E.S. has chosen to do in her case.

### III.    JURISDICTION

10.    Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §§ 1331 and 1343 because the matters in controversy arise under the laws and rules of the United States, as noted above.

### IV.    VENUE

11.    Under 28 U.S.C. § 1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiffs' claims occurred in the Western District of Texas and in the Waco Division.

### V.    PARTIES

12.    E.S. is a citizen of the state of Texas and now lives with her parents in Kempner, Texas, which is in Lampasas County.   At all pertinent times relevant to this lawsuit, E.S. was a pupil in the Copperas Cove Independent School District and lived in Bell County, Texas. It is uncontroverted that E.S. is a female student.

13.    In addition, Timothy and Betty Sawyer were at all pertinent times, citizens of the state of Texas, and now residents of Lampasas County and bring forward this complaint as E.S.'s parents, guardians, and next friends.

14.    Defendant Copperas Cove Independent School District is a school district organized under the laws of the state of Texas and at all times is required to follow the policies and

procedures as set forth by the School Board.  District personnel are thus responsible for the care, management and control of all public school business within its jurisdiction as to Plaintiff E.S., the training of teachers at the school as to safety, supervision of students within the district, and for the course of study.  They can be served by and through Copperas Cove Independent School District's Superintendent, Dr. Joe Burns, at 703 West Avenue D, Copperas Cove, Texas 76522.

## VI.    HISTORICAL BACKGROUND OF TITLE IX

15.    The Educational Acts of 1972 passed through Congress as Public Law No. 92-318, 86 Stat. 235 (June 23, 1972) and codified at 20 U.S.C. sections 1681 through 1688.  It is commonly known as "Title IX" and states (in part) that:

> *"No person in the United States shall, on the basis of gender, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."*

It is intended to remedy the effects of discrimination based upon sex, gender or gender stereotypes.  Moreover, it is to assure that a student is not a victim of bullying, harassment, sexual harassment, assault or sexual assault because of their membership in this protected class.

## A.    The Operative Law & Regulations

16.    The Department of Education promulgated rules to help implement Congress' intent at 34 C.F.R. §106.1, which became effective as early as July 1, 1975.  From the inception of

---

Title IX, the United States Department of Education ("DOE") in their *Office for Civil Rights* (OCR) issued policy guidance on discriminatory harassment.  They did so on discrimination based upon race (*see* 59 Fed. Reg. 11448 (Mar. 10, 1994) and later regarding harassment based upon sex ["Title IX"] (*see* 62 Fed. Reg. 12034 [Mar. 13, 1997]).  These policies made clear that school personnel must understand their legal obligations to address harassment based upon sex, gender and gender stereotypes and further, that they were in the best position to recognize and prevent the harassment, to lessen the harm to students if, despite their best efforts, harassment continued to occur and importantly, remedy the effects of the harassment.

**B.**     **Davis v. Monroe County Board of Education I and II**

17.     The controlling case on the subject of student upon student sexual harassment is <u>Davis v. Monroe County Board Of Education</u>, 526 U.S. 629 (1999).  Beginning in and about December 17, 1992, and continuing through May 19, 1993, LaShonda Davis, a student at the Monroe County Board of Education in Georgia began to be harassed by a fellow fifth-grade student, during school hours.  She filed a lawsuit against the School District, alleging she was a victim of discrimination based upon both constitutional law and statute. Her claims were dismissed at 862 F. Supp. 363 (M.D. Ga. 1994) and she appealed.  In 1997, the 11th Circuit affirmed the District's Court's decision in the <u>Davis v. Monroe County Board of Education</u> at 120 F.3d 1390 (11th Cir. 1997). She appealed again.

18.     On January 12, 1999, the Supreme Court heard oral argument in <u>Davis v. Monroe County</u>

Board Of Education.   During this same period, the United States Department of Education, Office of Civil Rights ("OCR"), promulgated a number of directives for school districts to follow regarding harassment, bullying, sexual harassment and even sexual assault.   Many were predicated on the regulations promulgated by the Department of Education, including those related to the procedural rights and protections students and their parents had pursuant to Title IX.

**C.     The United States Department of Education, Office of Civil Rights**

19.     Also in January of 1999, the OCR produced another document called *Protecting Students from Harassment and Hate Crime.*   It essentially provided a *Checklist* for school districts to follow, with the intent it would help school districts develop a culture inclusive of making schools safer for all students, helping to *prevent* harassment and sexual assault and to *remedy* its effects.   In a document of over 157 pages, it noted that sexual harassment, if ignored, could jeopardize a student's academic achievement, undermine their physical and emotional well-being, and often provoke retaliation.

20.     It listed a number of examples of effective actions including, most importantly: timely investigations, appropriate use of punishment, remedial actions like increasing adult supervision of "hot spots," close monitoring of the victim or perpetrator, use of informal conflict resolution, providing emotional and psychological support for the victim and perpetrator, and greater teaching across the school community including, and especially, staff.   It stressed the need for a compliance coordinator to assure that the school district followed the various directives developed by the OCR and that any such intervention

---

provided be assessed on an ongoing basis for effectiveness.

**D.**   **Davis v. Monroe County Board of Education, Supreme Court Decision**

21.   The Supreme Court announced its opinion on May 24, 1999, just months later.   The
Court reviewed the underlying facts and noted that LaShonda Davis was harassed by a
male student (G.F.) from approximately December of 1992 to the middle of May in 1993,
for just about six (6) months.   During this period, the boy attempted to touch her breasts
and genital area.   He also made vulgar statements occurring twice in January of 1993.
These three incidents were reported to the classroom teacher, who informed LaShonda's
mother and notified her of the school's vice-principal's awareness of the incident and his
full intent to take action.   The record reflects none was taken.   There are specific
allegations of two other incidents in February, one in gym class and another in the
classroom.   Both were reported.   Here again, the record reflects that no action was
taken.   There was another allegation in early March, and again, no action was taken.
Apparently, G.F. also bothered other females and as a group, the girls attempted to speak
with the school's principal about the situation, but he refused to do so.   Importantly, the
Supreme Court noted that no effort was ever made to separate G.F. and LaShonda, even
when she just wanted to change seats in class.

22.   During this period, LaShonda's grades fell and she became depressed and suicidal.

23.   The Supreme Court first addressed the School Board's argument that Title IX did not
extend to student upon student sexual harassment, because there was nothing in the
enabling legislation that would have put them on notice of such liability.    They

summarily rejected this contention and noted that the regulatory scheme promulgated by the Department of Education had long provided School Boards notice that they could be liable for failure to adequately respond to student upon student harassment. 119. S. Ct. 1671 *citing* 34 C.F.R. ¶106.31(b)(6) [aiding or perpetuating discrimination]; 106.31(d) [shall develop, design and implement procedure to stop the harassment]; 106.37(a)(2) [shall not approve or assist in discrimination]; 106.38; 106.51(a)(3)[1998].

24.     Additionally, the Supreme Court noted that School Boards were also on notice that they could be held liable for their own failure to address harassment and follow the guidelines developed by the Department of Education's *Office of Civil Rights* ("OCR"). 119. S.Ct. 1673 *citing* 62 Fed. Reg. 12034, 12039-12040 [1997]; 59 Fed. Reg. 11448-11449 [1994] and was another consideration that a school district could be considered *deliberate indifferent.*

25.     This case sets forth the elements necessary for a student to satisfy in order to hold a school district liable for violations of their rights pursuant to Title IX.  First, that the student must be member of a protected class; second, that the student be bullied, harassed or assaulted because of their membership in that class (based upon sex or gender); third, that the harassment be severe and pervasive; fourth, that the student experience a deprivation of educational opportunity; fifth, that the school district was on notice of the harassment and last, that they were *deliberately indifferent* to it.  Importantly, the Court affirmed that a public school district has a threshold duty not only to investigate the allegations in a timely manner, but a parallel duty to assure the student does not become

increasingly vulnerable to the harassment.   Moreover, the District has a duty to not only prevent ongoing and future occurrences of the harassment, but to remedy the effects of past harassment to assure the student was not vulnerable to further harassment.

26.     It noted that a school district could be held liable, even after one incident of sexual harassment.

**E.     More From The United States Department of Education, Office of Civil Rights**

27.     In 2000, and following the <u>Monroe</u> decision, the OCR sent out a *Memorandum* or *Dear Colleague Letter* to public school districts across the country noting they could be held liable for civil damages when a student is bullied or harassed based upon sex or gender, as previously noted in 62 Fed. Reg. 12034 (Mar. 13, 1997) and they were deliberately indifferent to such harassment.   It discussed, among other things, the profound effects of harassment on a student, the laws and rules that apply and how such harassment, when left unrequited, effects a student's equal opportunity under those laws to receive an education. It reiterated all the various interventions needed to satisfy federal law, rules and OCR directives.   It reinforced the duty to provide counseling to both the victim and even the perpetrator, and to have a program to assess the effectiveness of interventions and monitor unresolved issues.

28.     In January of 2001, the OCR issued a "Revised Sexual Harassment Guidance," giving notice to school districts that discrimination based upon gender, including and especially that such harassment is actionable, reiterating the standards of care enunciated in <u>Davis</u>. Over time the OCR issued various executive directives on issues of bullying, harassment

and discrimination based upon gender.  Its intent was to respond to <u>Davis,</u> and among other things, reinforced the need to inform students and their parents about their procedural rights in such an instance, including but not limited to the school district's grievance procedures.

29.    It provided school boards further direction with regard to its specific obligations and reiterated that in completing an investigation, the District should review the effect of the sexual harassment on the child's education; the type, frequency and duration of the conduct, the number of individuals involved, the location of incidents and the "totality of the circumstances."  Importantly, the school district is required to provide prompt and effective action, inform the family of the harassment the child was experiencing in a timely manner, and provide information about their procedural rights under the regulations including and especially a grievance process.  Most importantly, it noted the need for any investigation to be impartial.  Ultimately, if a student has been a victim of sexual harassment, the school district has a number of potential interventions available, including the provision of or paying for counseling, working with a tutor, and giving the student the opportunity to make up work.  Moreover, an essential part of a school district's duty is to provide ongoing assessment and follow up inquiries, as to the effectiveness or ineffectiveness of any remedy actually or attempted to be provided.

30.    In January of 2006, the OCR sent out another *Memorandum* or *Dear Colleague Letter* regarding harassment based upon sex or gender.  The letter enclosed the January 2001 "Revised Sexual Harassment Guidance" booklet.  Since that time, the OCR has sent out

a number of guidelines and directives, essentially reiterating a school district's duties in the instance they receive notice that a student alleges they have been a victim of bullying, harassment or assault based upon sex or gender.   They continue to have an independent duty to investigate allegations of sexual assault and harassment outside of any criminal inquiry.   They too have been incorporated into Texas law.

**F.**   **Texas Law**

31.   These federal guidelines and directives noted above, over the course of time, integrated into and became part of Texas law as well.   First, there were increased penalties in the Juvenile Justice system for students who assaulted, bullied and harassed other students. In addition, the Texas Education Agency ("TEA") and their various local service centers working under TEA's purview developed and disseminated a significant amount of support material for school boards as how to best prevent bullying and harassment in general, and bullying and harassment based upon disability in particular.

32.   In addition, School Boards were provided information on how to best respond to bullying and harassment, when it occurred.   For instance, on May 3, 2005, the Texas House of representatives promulgated H.B. 283 which modified and added sections to the Texas Education Code regarding bullying and harassment, significantly relying upon the federal *Safe School Act.*   It added §25.0341, giving students who were bullied the right to seek a transfer to another classroom or campus. It amended Section 37.001 by adding Subsection(a)(7) and (8) requiring a School Board to adopt a "Student Code Of Conduct" which considered, among other things, bullying, harassment, and the duty to have

methods (emphasis added) to prevent and intervene in bullying problems.

33. It also amended §37.083(a) by requiring the school district to adopt and implement a "discipline management program to be included in the (school) district improvement plan." The program must (emphasis added) provide for prevention and education about unwanted verbal aggression and bullying. It took effect no later than September 1, 2005. It included strategies to handle mental health issues.

34. Further, School Boards were provided significant information from the Texas Association Of School Boards ("TASB") on how to best respond to assaults, bullying and harassment, when it occurred. In fact, in September of 2008, TASB disseminated a memorandum entitled *Harassment and Bullying Policies in Public Schools.* It noted the requirement that schools must have an active policy and practice regarding "student-to-student harassment." It noted, among other things, that a school district could be liable when there is student-to-student harassment and the district's "deliberate indifference cause students to undergo harassment or makes them vulnerable to it, and the harassment takes place in a context subject to the school district's control," *citing* Davis v. Monroe County Board Of Education. 526 U.S. 629 (1999).

35. In regard to addressing issues of assault, bullying, and harassment, it referred school districts in Texas to look to the Office of Civil Rights, *Protecting Students from Harassment and Hate Crimes: A Guide For Schools* (as noted above). In addition, the TASB also helped Copperas Cove Independent School District to develop a number of very specific policies, procedures and practices related to bullying, harassment and sexual

assault.

36. In 2011, the Texas Legislature again addressed bullying and harassment in the public schools by passing comprehensive and far-reaching legislation on the topic.   Put into the Texas Education Code, staff was required to have specialized training (Section 21.451) and rather than having victims transfer from their home campus, now the bully had to transfer (Section 25.0342) and other related issues were addressed, Sections 37.001[Code of Conduct], 37.083 [Discipline Management], 37.0832 [Prevention].   Importantly, a School District in Texas was required to have specific training for staff in early mental health intervention and suicide prevention. Texas Health & Safety Code, Section 161.325.

**G.     Policies & Procedures Developed by the Copperas Cove Independent School District**

37. The Copperas Cove Independent School District has long held and re-authorized policies and procedures related to *Student Welfare* and keeping students free from Discrimination, Harassment & Retaliation that address, among other things, student-student sexual harassment and assault.   It specifically *cites* a number of civil cases, chief among them the Davis decision noted above.   It sets out definitions of sexual harassment, information about reporting allegations of bullying and harassment, and their own investigatory procedures.   It required allegations of bullying and harassment based upon sex or gender to be directed to the school district's Title IX Coordinator, and the family be given that person's contact information.   The family also was required to receive actual notice of their procedural rights.   The school district's investigation needed to be completed in a

timely manner, usually less than 10 days, that a written report should be developed and interim action taken, as appropriate.   The report must address whether or not prohibited contact occurred and must be filed with the relevant school district official.   If a student is not satisfied with the outcome of the investigation, they have the right to appeal the decision through the District's grievance procedure or even with the Office of Civil Rights within the U.S. Department of Education.

38.   The School Board's policies also note a non-exhaustive list of potential corrective actions to assure the student is not vulnerable to not only future assaults, but to remedy the effects of the harassment. They include a training program for the victim and perpetrators, a comprehensive education program for the school community, and counseling to the victim and perpetrators(s).   Importantly, there needed to be a system in place to follow-up and determine if new incidents had occurred and the effectiveness of those provided.   There is also discussion of increasing staff monitoring and assessment of the problem.

39.   The Copperas Cove Independent School District policy and procedures which were developed to address bullying, harassment, assault or even sexual assault based upon sex or gender fully follow the requisites of federal and state law, federal rules and regulations, case law, OCR guidelines and professional standards of care, all as noted above.

## VII.   STATEMENT OF FACTS

**A.**   **About E.S.**

40.     E.S., was born on September 26, 2000.

41.     During the time period that was the basis of this complaint, E.S. was a student at the high school within Copperas Cove Independent School District.

42.     She was actively involved in school through the choir, Color Guard, and theater programs.

43.     In fact, she received the recognition of Level 5 Distinguished Honors student.

44.     Her plan was to major in Forensic Science and Theatre at the University of Texas.

**B.     E.S. was sexually assaulted at the high school**

45.     On December 17, 2015, E.S. stayed after school like she had almost every day for 3 months attending rehearsals for an upcoming play.   She had the lead female role.   That particular day was their dress rehearsal.   Her mother, Betty Sawyer, received a text from E.S.'s teacher, Ms. Maberry, stating that rehearsals would run from about 2:00 p.m. to 4:00 p.m.

46.     E.S. had just changed out of her costume and was starting to gather up her things when a student, D.H., asked her to walk with him to the auditorium.   He said that he forgot his script in the auditorium.   E.S. said, "Sure," and she walked with him.   They had been friends, and she did not feel like she had a reason not to trust him.

47.     When they walked into the auditorium, D.H. wanted E.S. to go upstairs to the TECH Room with him, but E.S. said that she could not do that because she was not allowed upstairs.   D.H. went up, got his script, and then he came back down.   When he came down he pulled E.S. into the stairway and started kissing her.   Then he unzipped his

pants and pushed on her shoulders to force her down in a crouching position.

48.     When she tried to pull away, D.H. gripped her shoulders and the back of her head, forcing her to perform oral sex on him.

49.     Then D.H. pulled E.S. up, pinned her against a wall, and then pushed her down into a kneeling position on the staircase with her elbows holding her up.

50.     E.S. tried to pull away, but D.H. grabbed her and pulled her back.  E.S. told him to stop, but he would not.  She became submissive and suffered in silence while he raped her, damaging her genital area.

51.     She did not bother screaming because she knew the staff were gone, and nobody was around to hear her.

52.     When he was finished raping her, E.S. quickly got up and left. As she was leaving D.H. called out, "Well at least have a good Christmas!"

53.     E.S. came out of the auditorium visibly upset. She ran to the first people she trusted that were still in the building, K.B. and Q.T., and told them what had happened.

54.     K.B. hugged her, and Q.T. chased after D.H., who eventually locked himself in the band room and would not come out.

55.     K.B. told E.S. that she had to report the rape and told her that she was going to let Ms. Maberry know what happened.

**C.      The Post-Incident Period**

56.     Tim and Betty Sawyer had to go pick up their youngest child from school at about 4:00 p.m., so they knew they would be running a little late for E.S. that day.   They had

instructed her to walk to her grandmother's house after school, and they would pick her up from there.

57.     When they turned down E.S.'s grandmother's road at approximately 4:15 p.m., their daughter came running down the driveway crying.   E.S. proceeded to run down the street and would not stop when they called out to her.

58.     They turned their car around and started driving beside her as she turned the corner and hit the ground, curled up into a ball, and cried on the side of the road.

59.     They parked the car on the side of the road and put the hazard lights on.   Mr. Sawyer was the first one to reach E.S.   He asked E.S. what was wrong.

60.     E.S. started screaming out, "DON'T TOUCH ME, DON'T TOUCH ME!"   She then told her parents that she had just been raped by D.H.

61.     Mrs. Sawyer called 911 at 4:31 p.m.

62.     She told the dispatcher what her daughter had just told her and gave their location. Officer Ferdinand with the Copperas Cove Police Department responded.   When he arrived, he began to question E.S. about what happened to her.   He advised the family to take her to Scott & White Hospital for a SANE exam.

63.     They got to the hospital at about 6:00 p.m.

64.     E.S. met with a Social Worker at the hospital named Susan and told her about being raped by D.H.

65.     E.S. was also seen by medical professionals for her physical injuries.

66.     About 8:00 p.m., Officer Ferdinand called Mrs. Sawyer and told her to bring E.S. to the

police station after leaving the hospital.

67.    Finally, at about 9:30 p.m., the SANE examination was completed and a nurse administered a number of medications to prevent infection, where D.H. had torn her vaginal area.  E.S. was told, among other things, to take baths to keep the tear from becoming infected.

68.    E.S. left the hospital with her parents around 10:00 p.m.

69.    Mrs. Sawyer had texted Ms. Maberry who returned her call on or about 10:22 p.m. Mrs. Sawyer then explained what had happened to her daughter.  Ms. Maberry apologized about what had happened and told Mrs. Sawyer she did not realize that students were still on campus.  She said that she left school early so she could get to Round Rock in order to meet a friend.

70.    Mrs. Sawyer told Ms. Maberry that E.S. still wanted to continue with the play but her first concern was the fact that D.H. was in the same Tech Class and was supposed to be running the sound during the play.  Mrs. Sawyer told Ms. Maberry that E.S. would not be at the play if D.H. was permitted to be there.  Ms. Maberry reassured her that they would get in touch with D.H. to let him know not to come because she would rather "tell a techie not to come rather than lose [her] lead actress."

71.    E.S. and her parents arrived at the police station at 11:00 p.m. and met with Officer Ferdinand and another officer.  They declined to take E.S.'s statement and said a detective would contact her for a full interview.  The next day, Mrs. Sawyer called the Copperas Cove Police Department and spoke with Detective Hurt.  Detective Hurt stated

that Officer Ferdinand had already filed a written report [1] that the incident was consensual.

72.    Mrs. Sawyer was concerned that Officer Ferdinand had filed a report after only briefly speaking with E.S. on the side of the road.

73.    Mrs. Sawyer complained and the Detective agreed to arrange for a forensic interview for Monday, December 21st.

**D.     After the Incident**

74.    On December 18th, 2015, E.S. was getting ready for her play, and Mrs. Sawyer wanted to go in with E.S. to make sure that D.H. was not there.  She was also accompanied by G.A., who was there to monitor her well-being.

75.    Mrs. Sawyer texted Ms. Maberry at 5:37 p.m., who texted back telling her not to worry, that she and Mrs. Pastore were keeping an eye on E.S.

### 1.     *The Inquiry Loses Impartiality*

76.    At school that day, Ms. Maberry and Mrs. Pastore pulled E.S. into the hallway and proceeded to tell E.S. that D.H. was a good kid and is well known and liked in this school.  Further, "This is completely out of his character." She also told E.S. not to tell anybody else about what happened and that she should have never given an *outcry* to K.B. and Q.T."

77.    Later, when E.S. went into the auditorium for the play, Ms. Maberry and Mrs. Pastore called her out into the hallway and told her that she better not be lying about what

---

[1] Without ever bothering to fully interview E.S. It should be noted that on information and belief, D.H.'s mother

happened just to keep herself from getting in trouble for having sex in the auditorium with D.H.

78.   Mrs. Sawyer did not receive a call back from the police so she called the Family In Crisis and spoke with Rachele who told her that the hospital should have appointed an Advocate for E.S.   Mrs. Sawyer noted they had not and reported her distrust of the Copperas Cove Police Department and was referred to the Bell County Sheriff's Office who referred Mrs. Sawyer to the Coryell County Sheriff's Office.   Upon calling them she was referred back to the local police department.   Mrs. Sawyer believed she was getting "the run around."

79.   At about 11:00 a.m. on the 19th, E.S. had an emergency session with a professional counselor discussing, among other things, how she could proceed in the play that night.

   ***2.     The Show Goes On***

80.   In the afternoon, Mrs. Sawyer contacted Ms. Maberry asking for contact information for the school Principal, Mr. Timarky.   Ms. Maberry told Mrs. Sawyer that Mr. Timarky was going to let the police handle it.   Mr. Sawyer then attempted to contact the Superintendent of the School District, Mr. Burns.

81.   On December 19th, 2015, Mrs. Sawyer took E.S. back to the school on Saturday night for the second night of the play.

82.   E.S. went in to get dressed for her play.   When she came out in the hall, she saw that D.H. was there.   She went in and asked Ms. Maberry why he was there, and the teacher

---

worked with the police department.

replied that he had every right to be there and that because he was not charged, she could not make him stay away.

### 3.    The Retaliation Begins

83.    Ms. Maberry told E.S. that she could get fired for what happened and told her that [E.S.] was just as much at fault for what happened as D.H. was because she went into the auditorium with him.   E.S. said, "So you're more worried about your job than my safety?"   Ms. Maberry replied, "You're not worried about my job? I'm the one who put you in that lead role, and you will never be casted in another play."

84.    She also told E.S. that it was better that she and D.H. get in a little bit of trouble for having sex at school rather than having his life ruined.

85.    E.S. again pressed Ms. Maberry and Ms. Pastore about why D.H. was allowed to be there that evening.   They condescendingly responded that they could make him leave if that would make her feel better.   E.S. questioned why he was permitted to show up on Saturday, when E.S. was told D.H. was not permitted to be there the night before.   Ms. Maberry "corrected" E.S., saying that she had told E.S. that D.H. would not be there "on Friday," but had indicated nothing about Saturday.

86.    E.S. then left the auditorium in tears and told her mother what was going on.   Her mother told her that she could not stay with D.H. there.   She said she knew that and had tried to talk to Ms. Maberry about it because Ms. Maberry had previously promised that D.H. would not be there, yet there he was.

### 4.    The Investigatory Process Is Flawed

87.   Soon after the family left the school, Principal Timarky returned a call to Mr. Sawyer, but by then it was too late.

88.   Mrs. Sawyer went to the Copperas Cove Police Department in an effort to file harassment charges against the teachers, but was told they could not do that.

89.   Finally, Mr. Timarky and Mrs. Sawyer spoke, and he said that Ms. Maberry had not told him anything about the rape and that he would be in contact with Superintendent Burns.

90.   On Sunday, December 20th, the family received a call from the District's Superintendent, Dr. Burns.  He stated that there were cameras in the area, and he would review them. He apologized for the statements made by Ms. Maberry and Mrs. Pastore and for the harassment E.S. experienced.   He agreed it was the policy to protect the victim first, and that D.H. should have been removed from the school or the play should have been canceled.

### 5.    *The Process Is Not Impartial II*

91.   On Tuesday, December 22nd, Mrs. Sawyer was referred to a local agency, the Child Advocacy Center.

92.   The Advocate from the Family in Crisis Group, Ms. Rowe, came to the Child Advocacy Center.  Ms. Rowe shared with Mrs. Sawyer that she had reviewed the FIC Hotline Sheet, and they had not received a phone call from the hospital staff, which was usually done in such circumstances.  An interview was completed, and Detective Hurt reported that she believed the sex was consensual.  She noted Officer Ferdinand's report mentioning a statement that "E.S. was super into D.H.," which was apparently stated by

D.H. himself, and never from E.S.  Mrs. Sawyer responded that E.S. had consistently reported she was raped from the first moment she was able to do so and had specifically told Officer Ferdinand she was raped (and Mrs. Sawyer was there at the time and heard this outcry).  The Detective stated they would not file charges against D.H.  The Detective then stated that E.S. would have to figure out how to get along with D.H. who would be at school, when it started again after the holiday.

### 6.      The Process Was Never Impartial

93.   On or about December 23rd, Mrs. Sawyer began some online research and social media review.  Apparently D.H.'s mother was Vonya Hart, a former employee with the School District as a Behavioral Health Specialist.  Moreover, Hart does counseling at the Scott & White Hospital (where E.S. had the SANE exam) for victims of sexual abuse and has a counseling center in Killeen.  She also has been listed as a Coordinator for the local Family Advocacy Program.  At this point, Mrs. Sawyer realized that whether it be Ferdinand or Hurt, or anyone else investigating the case, E.S. would never get a fair and impartial assessment of the situation.

94.   After Christmas, Mrs. Sawyer contacted the hospital attempting to find out the name of the SANE nurse and why she had never been called back by the nurse or anyone with the hospital (as had been promised).  Shortly thereafter, Gessica Finley, the Forensic Nurse Coordinator called and told Mrs. Sawyer the name of the SANE nurse was Crystal Love and the name of the caseworker was Susan.  More importantly, Finley noted there was not much in her daughter's file.  In addition, hospital protocol required E.S., even though

she was a minor, to sign a number of documents, including a consent to treat form.   E.S. reports she did not sign any consent forms at all.   Finley noted that these failures "were not common practice," and that Mrs. Sawyer could file a complaint with "Patient Relations" because of what took place at the hospital.

95.   Mrs. Sawyer also contacted the local District Attorney's Office, where she was told, among other things, that if there was a conflict between the rendition between the story of the victim and alleged perpetrator, then Detective Hurt had a duty to seek guidance from the D.A., and the detective had not.

96.   After that comment, and in addition to all that occurred before, E.S.'s parents did not feel safe having her at the high school and having her walk the halls where her rapist was free. Mrs. Sawyer contacted Superintendent Burns about removing E.S. from the District, upon return from the Christmas holidays, on January 4th.   Mrs. Sawyer asked Dr. Burns if he had seen the video, and he reported he had not, but the District Campus Officer, Torres and Detective Hurt had seen it.

97.   On or about January 9th, Principal Timarky called a number of students from the Theatre Program into his office.   He never contacted the two students who were with E.S. after the initial outcry, K.B. and Q.T.

98.   Throughout this family's ordeal, E.S. and her parents have felt that CCISD administration has not been on the student's side, let alone being her advocate for educational and artistic success. The school has not reached out to E.S. or her family to ask, "What can we do to fully address this situation and help [E.S.] overcome and succeed?"   In fact, the

School Superintendent, Dr. Burns, advised E.S. to attend the Alternative School, if she did not feel safe at the regular campus.

### 7.     *The Spring of 2016- More Retaliation*

99.     After withdrawing E.S. in the Spring of 2016, Mrs. Sawyer home-schooled her for the rest of the semester.  She volunteered to help with the Copperas Cove Jr. High Choir, which her brother was in at the time, for their upcoming spring musical.  She spent her days at the Jr. High after school hours to help.  The play was held at the only Auditorium the School District has, at the Copperas Cove High School.

100.     When Principal Timarky saw that E.S. was there, he contacted the Jr. High Principal and told him that she was not allowed on campus.  The Jr. High Principal, Mr. Troub (at that time), contacted Mrs. Owens, the Copperas Cove Jr. High Choir teacher and complained to her for permitting E.S. to volunteer with the musical.

101.     E.S. returned to the campus in the fall of 2016, because D.H. had graduated.  The family was told that she would have a support system in place.  Further, she would receive assistance in picking up her classes as if she never left.  Dr. Burns told us that he would contact the high school ahead of time and have the counselor and registrar working on getting her set up.  This never happened.  According to Copperas Cove High School, they never heard anything from Dr. Burns.

102.     Not only did E.S. not have a support system in place, her classes were not scheduled correctly. In fact, E.S. lost her accreditation and the goals that she has had in place since 6th grade or earlier because of this failure.  There was a new theater teacher at the high school, Mrs. Tagliabue, but

she made it very clear to E.S. that she communicated with Ms. Maberry daily and was good friends with her.   The message was clear, Mrs. Tagliabue did not want anything to do with E.S. and, even though she previously played the lead female role, did not get cast at all in any plays or with the *Im-prov* team after returning to the high school.

**E.     The District Failed to Follow the Requisites of Title IX**

103.    As noted above, whether pursuant to case law, federal law, federal regulations, federal executive agency directives, OCR guidelines Texas law and especially any and all of the District's policy and procedures, once a teacher like Ms. Maberry was on notice that a student like E.S. was a victim of sexual assault, she, and by extension, the School District had any and all of the following duties.

a.     The District had a duty to immediately provide the family notice of any and all procedural rights they may have had.   Those rights include, but are not limited to, reducing the Complaint to writing and giving it to the School District's Title IX Coordinator, or their designee.

b.     Further, that the Investigator has ten days to complete an investigation.

c.     The investigation requires that all witnesses be interviewed.

d.     Further, that all statements be reduced to writing.

e.     When complete, a written report is required.

f.     Importantly, the investigation must be impartial.

g.     The family is to be provided a copy of the final report.

h.     If the family is unhappy with the findings, they must be given information about

the right to appeal the findings through the School District's Internal Grievance Policies.

i.     Additionally, the family must be given information about the ability to file a separate complaint with the Texas Education Agency or Department of Education's *Office of Civil Rights.*

j.     Further, the parents are to be provided information about potential services that should be offered E.S., both during the investigatory process and thereafter, regardless of whether sexual harassment assault is ever found.

k.     For instance the School District may offer the student who was victimized any of the following:

    i.     Counseling;

    ii.     Psychological testing;

    iii.     Social skills training;

    iv.     Self-advocacy training;

    v.     Referral to community resources;

    vi.     A one-to-one paraprofessional to provide monitoring of the Victim;

    vii.     A one-to-one paraprofessional to provide monitoring of the Perpetrator;

    viii.     An increase in supervision at "hot spots;"

    ix.     Removal of the perpetrator from the same classes as the victim; and

    x.     Pursuant to Texas Law removal of the perpetrator from the same school as the victim.

104.   The District followed none of the procedural guidelines to E.S. and her family.

105.   Not surprisingly, because none of the above-noted interventions were provided, the academic and non-academic environment was obviously hostile for her, especially after she got blamed for reporting the incident and becoming potentially responsible for the teacher's job loss and her rapist's future.

106.   Soon she became a victim of retaliation and derision.

107.   As noted above, E.S. and her family finally had to leave the School District.   In doing so, she lost her opportunities to be in choir, theatre, and color guard.

108.   As a result of her experiences at CCISD, E.S. is not eating or sleeping well.   She continues to require extensive and ongoing counseling, as she continues to work through depression, anxiety, and Post-Traumatic Stress Disorder.

## VIII.   CLAIMS PURSUANT TO 20 U.S.C. §§ 1681-1688 AND TITLE IX
## OF THE EDUCATION AMENDMENTS ACT OF 1972

109.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

110.   Plaintiffs contend the School District, acting under color of law and acting pursuant to customs and policies of the district, deprived E.S. of rights and privileges secured to her by Title IX of the Education Amendments Act of 1972 and by other laws of the United States by discriminating against her on the basis of gender and gender stereotypes.

111.   The acts and omissions of the School District deprived E.S. of her right to not be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial assistance, on the basis of her sex or gender stereotypes for which the School District Defendant is liable to E.S. pursuant to 20 U.S.C §§ 1681-1688 for compensatory damages.

112. Plaintiffs further contend that E.S. became a victim of retaliation due to her own advocacy and her parents' advocacy on behalf of their daughter. Such advocacy is a protected measure and any interference with such advocacy, or intent to chill or punish such advocacy, is also actionable pursuant to Title IX.

## IX.    RATIFICATION

113. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

114. Copperas Cove Independent School District ratified the acts, omissions and customs of School District personnel and staff.

115. As a result, Copperas Cove Independent School District is responsible for the acts and omissions of staff persons who were otherwise responsible for the safety of E.S.

## X.    PROXIMATE CAUSE

116. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

117. Each and every, all and singular of the foregoing acts and omissions, on the part of the School District, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XI.    DAMAGES

118.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

119.    As a direct and proximate result of the School District's conduct, E.S. has suffered injuries and damages, for which she is entitled to recover herein within the jurisdictional limits of this court, including but not limited to:

a.    Physical pain in the past;

b.    Medical expenses in the past;

c.    Mental anguish in the past;

d.    Mental anguish that, in reasonable probability will be suffered in the future;

e.    Mental health expenses in the past;

f.    Mental health expenses that, in reasonable probability will be suffered in the future;

g.    Physical impairment in the past,

h.    Loss of future earning capacity;

i.    Loss of various academic and non-academic opportunities; and

j.    Various out-of-pocket expenses incurred on behalf of E.S., by and through her family, for treatment.

120.    In addition, Timothy and Betty Sawyer experienced derivative costs due to the need to move from the Copperas Cove area.

## XII.    ATTORNEY FEES

121.   Plaintiffs incorporate by reference all the above-related paragraphs, as if fully set forth herein.

122.   It was necessary for Plaintiffs to retain the undersigned attorneys to file this lawsuit. Upon judgment, Plaintiffs are entitled to an award of attorney fees and costs pursuant to Title IX and pursuant to 42 U.S.C. §2000d et seq.

### XIII.   EQUITABLE RELIEF

123.   Plaintiffs Timothy and Betty Sawyer, respectfully request the Court consider ordering the Copperas Cove Independent School District to:

a.   Adopt a bullying, harassment, and sexual assault program that is provided by a third-party, like the Anti-Defamation League or the Southern Poverty Law Center;

b.   Adopt policies, procedures, and practices commensurate with the "Dear Colleague Letter", dated October 26, 2010, from the United States Department of Education Office for Civil Rights to include but not be limited to:

i.   the provision of school assemblies and instruction on bullying, harassment and sexual harassment;

ii.   addressing bullying, harassment and sexual harassment based upon disability or race or gender or common stereotypes that accompany those subjects in classroom intervention settings;

iii.   conducting a bullying, harassment and sexual harassment assessment at each campus;

---

iv.     forming a sexual harassment prevention coordination team at each school;

v.      include language specifically identifying bullying, harassment and sexual harassment based upon disability or race or gender and common stereotypes that accompany those subjects in the school rules and student handbook;

vi.     develop a strategy to prevent such bullying, harassment and sexual harassment in hot spots;

vii.    post signs in classrooms prohibiting bullying, harassment and sexual harassment and listing its consequences; and

viii.   provide a place and manner of confidential reporting and encouraging students to help classmates who are being bullied, harassed and sexually harassed and to report such bullying, harassment and sexual harassment;

c.      That for the next three years, the School District provide for a school-safety coordinator for each campus, so as to assure that the program is enacted comprehensively;

d.      That the School District retain a neutral third party to complete a bullying assessment for each campus and have that person or entity report back to the President of the School Board and Superintendent so the School District may address any issues noted in the assessment;

e.      That staff receive "diversity training" by a third party to include information about gender, race, and disability stereotypes;

f.    That the School District provide a marker in the high school library, where books and other materials would be made available to students dealing with bullying harassment, and related emotional concerns and issues related to gender, race, and disability along with common stereotypes that accompany those subjects;

g.    That anti-bullying month be recognized by the Copperas Cove Independent School District; and

h.    That the School District help facilitate the provision of counseling services for students deemed to be at risk.

124.   That the School Board appoint a committee, including interested members of the public, to address the issues noted herein, report back to the Board, and to act accordingly.

## XIV.   DEMAND FOR JURY TRIAL

125.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray for judgment against the District in the manner and particulars noted above, and in an amount sufficient to fully compensate them for the elements of damages enumerated above, judgment for damages, recovery of attorney's fees and costs for the preparation and trial of this cause of action, and for its appeal if required, pursuant to Title IX, 42 U.S.C. § 2000d et seq.; together with pre- and post-judgment interest, and court costs expended herein, as well as the equitable issues noted above; and for such other relief as this Court in equity, deems just and proper and for such other

relief as the Court may deem just and proper in law or in equity.

Respectfully submitted,

CIRKIEL & ASSOCIATES, P.C.
1901 E. Palm Valley Boulevard
Round Rock, Texas 78664
Phone: (512) 244-6658
Fax:     (512) 244-6014

By:     /s/ Martin J. Cirkiel
        Martin J. Cirkiel
        Fed. ID No. 21488
        Texas Bar No. 00783829
        marty@cirkielaw.com

and

THE CARLSON LAW FIRM, P.C.
11606 North IH-35
Austin, Texas 78753
Phone: (512) 346-5688
Fax:     (512) 719-4362

By:     /s/ L. Todd Kelly
        L. Todd Kelly
        Texas Bar No. 24035049
        tkellyefile@carlsonattorneys.com
        Terria M. Hutchinson
        Texas Bar No. 24078708
        thutchinson@carlsonattorneys.com

ATTORNEYS FOR PLAINTIFFS